ALEX G. TSE (CABN 152348)
United States Attorney

SARA WINSLOW (DCBN 457643)
Chief, Civil Division

KIMBERLY FRIDAY (MABN 660544)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7102
    FAX: (415) 436-6748
    kimberly.friday@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
|     Plaintiff, | |
|   v. | |
| UNITED MICROELECTRONICS CORPORATION; FUJIAN JINHUA INTEGRATED CIRCUIT, CO., LTD.; and CHEN ZHENGKUN a.k.a. STEPHEN CHEN, | **UNITED STATES' COMPLAINT FOR INJUNCTIVE RELIEF** |
|     Defendants. | |

## INTRODUCTION

1.     The United States of America ("United States") brings this action against Defendants United Microelectronics Corporation ("UMC"), Fujian Jinhua Integrated Circuit, Co., Ltd. ("Jinhua"), and Chen Zhengkun a.k.a. Stephen Chen ("Chen"), pursuant to 18 U.S.C. § 1836, to obtain permanent injunctive relief to prevent Defendants from (1) exporting, reexporting, causing the export of, attempting to export to the United States; selling or supplying, directly or indirectly to the United States; or causing the import into the United States of, any products containing DRAM manufactured by Jinhua or UMC; or conducting any transaction that evades or avoids or has the purpose of evading or avoiding that

U.S. COMPLAINT                     1
FOR INJUNCTIVE RELIEF

prohibition; or (2) transferring or in any way conveying Trade Secrets 1-8 (described below) to any other individual or entity; and for all such further relief as may be just and proper.

2. The United States has criminally charged Defendants UMC, Jinhua, and Chen with conspiracy to commit economic espionage in violation of 18 U.S.C. § 1831(a)(5); conspiracy to commit theft of trade secrets in violation of 18 U.S.C. § 1832(a)(5); and knowing receipt, purchase, and possession of trade secrets, knowing them to have been stolen and appropriated, obtained, and converted without authorization, in violation of 18 U.S.C. §§ 1831(a)(3) and 2.  *See* Indictment, *United States v. United Microelectronics Corp., et al.,* 18-CR-465-LHK (N.D. Cal. filed Sept. 27, 2018) ("Indictment").

3. As set forth in the Indictment, dynamic random-access memory ("DRAM") is a memory device product used in electronics to store information. DRAM stores each bit of data in a separate tiny capacitor within an integrated circuit. DRAM is a technologically advanced commodity; it is widely used in digital electronics where low-cost and high-capacity memory is required. DRAM is used in leading-edge computing, consumer, networking, automotive, industrial, embedded, and mobile productions, and is a product that is used or intended for use in interstate or foreign commerce.

4. Growth of the electronics industry in the People's Republic of China ("PRC") created significant demand for memory products such as DRAM. The Central Government and State Council of the PRC publicly identified the development of DRAM technology as a national economic priority because PRC companies had not been able to develop technologically advanced DRAM production capabilities, and PRC electronics manufacturers relied on producers outside the PRC to supply DRAM. DRAM production technology was closely held by manufacturers in the United States, South Korea, and Taiwan, including Micron Technology, Inc. ("Micron"), which had improved the technology through intensive research and development over many years.

5. Aware of the PRC's national priority and the barriers placed by non-PRC manufacturers, including Micron, on access to the technology, Defendants UMC and Chen obtained DRAM trade secrets

belonging to Micron and conveyed information containing those trade secrets to Defendant Jinhua, a company controlled by the PRC government, without authorization from Micron.

## JURISDICTION AND VENUE

6. This action arises under 18 U.S.C. § 1836(a), which permits the Attorney General to "obtain appropriate injunctive relief" against violations of 18 U.S.C. §§ 1831 and 1832. This Court has subject matter jurisdiction over this action under 18 U.S.C. § 1836(c), 28 U.S.C. § 1345, and 28 U.S.C. § 1331.

7. This Court may exercise personal jurisdiction over Defendants UMC, Jinhua, and Chen because each of the defendants committed an act in furtherance of the offenses in this District, as set forth below. In addition, UMC and Jinhua have purposefully availed themselves of the protections of U.S. law by applying for and obtaining U.S. patents containing the stolen trade secrets, as set forth below. UMC has also incorporated a wholly-owned subsidiary that it uses as its North American sales arm, UMC Group (USA), in California, with a principal place of business located in this District.

8. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(3), (c)(2), (c)(3), and (f)(3), and 18 U.S.C. §1837, because an act in furtherance of the offenses occurred in this District.

## INTRADISTRICT ASSIGNMENT

9. The acts in furtherance of the offenses in this District occurred in Santa Clara County and Alameda County.

## THE PARTIES

10. Plaintiff, the United States of America, acts pursuant to the authority in 18 U.S.C. § 1836 to file a civil suit to obtain appropriate injunctive relief against violations of 18 U.S.C. §§ 1831 and 1832.

11. Defendant UMC is a semiconductor foundry company headquartered in Taiwan with global offices in Taiwan, China, Europe, Singapore, Japan, Korea, and the United States, including the

offices of its wholly-owned subsidiary, UMC Group (USA), in Sunnyvale, California. UMC Group (USA) is a California corporation with a principal place of business at 488 Deguigne Drive, Sunnyvale, California. In its SEC Form 20-F for fiscal year ended December 31, 2017, UMC stated that its "sales in North America are made through UMC Group (USA), our subsidiary located in Sunnyvale, California." UMC is publicly listed and traded on the New York Stock Exchange. UMC did not, prior to the alleged theft of trade secrets set forth in this Complaint, possess advanced DRAM-related technology.

12. Defendant Jinhua was established in early 2016 in the Fujian Province of China for the sole purpose of designing, developing, and manufacturing DRAM. Jinhua was created with US$5.65 billion in funding provided by the PRC government and PRC government entities. Its two major shareholders were Electronics & Information Group Co., Ltd. and Jinjiang Energy Investment Co., Ltd., which were PRC state-owned enterprises.

13. Defendant Chen is a Taiwanese national and former General Manager and Chairman of Rexchip Electronics Corporation ("Rexchip"). Micron acquired Rexchip in or around 2013, and renamed it Micron Memory Taiwan Co., Ltd. ("MMT"). Chen became the President of MMT and Site Director of MMT's Fabrication Facility 16, responsible for making Micron's 25nm DRAM chip. Chen resigned from MMT in July 2015 and began working for UMC as its Senior Vice President and Fabrication Director in Taiwan in September 2015. In or around January 2016, Chen helped negotiate the terms of a technology cooperation agreement between UMC and Jinhua and became the Senior Vice President of UMC's newly formed New Business Development ("NBD") division, tasked with overseeing UMC's F32nm DRAM development project and the technology cooperation agreement between UMC and Jinhua. In or around February 2017, Chen became the President of Jinhua in charge of its DRAM production facility.

//

//

//

U.S. COMPLAINT
FOR INJUNCTIVE RELIEF

4

**VIOLATIONS OF 18 U.S.C. §§ 1831 and 1832**

As set forth in the Indictment and below:

Violations of 18 U.S.C. § 1831(a)(5): Conspiracy to Commit Economic Espionage

14. Beginning in or about January 2016, and continuing to present day, defendants UMC, Jinhua and Chen, along with others named as defendants in the Indictment, knowingly combined, conspired, and agreed to:

    a. knowingly steal and without authorization appropriate, take, carry away, and conceal, and by fraud, artifice and deception obtain trade secrets belonging to Micron;

    b. knowingly and without authorization copy, duplicate, sketch, draw, photograph, download, upload, alter, destroy, photocopy, replicate, transmit, deliver, send, mail, communicate, and convey trade secrets belonging to Micron; and

    c. knowingly receive, buy, and possess trade secrets belonging to Micron, knowing the same to have been stolen, appropriated, obtained, and converted without authorization; intending and knowing that the offenses would benefit a foreign government, namely the PRC, and a foreign instrumentality, namely Jinhua,

in violation of Title 18, United States Code, Section 1831(a)(5).

15. In order to develop DRAM technology and production capabilities without investing years of research and development and the expenditure of many millions of dollars, UMC and Jinhua, a company entirely funded by the PRC government, and employees of both, conspired to circumvent Micron's restrictions on its proprietary technology and illegally obtain DRAM technology that had been developed by Micron, including Trade Secrets 1 through 8, discussed *infra* Paragraphs 33-40.

16. In or around early 2016, the PRC formed and funded Jinhua for the purpose of developing, designing, and mass-producing advanced DRAM technology. The PRC prioritized the development of integrated circuit devices, which included DRAM, in its 13th Five-Year Plan, a national plan that included objectives for China's economic priorities for the years 2016-2020, ratified by the National People's Congress, and which established the Chinese Communist Party's

vision for the country's future developments.

17. In or around January 2016, UMC entered into a technology cooperation agreement with Jinhua to develop DRAM technology for a product that UMC referred to as the "32nm and 32Snm DRAM" or "F32nm/F32Snm DRAM." Under the technology cooperation agreement, UMC would provide the DRAM research and development, and Jinhua would provide the manufacturing and fabrication facilities to mass produce DRAM. UMC and Jinhua were to jointly own the DRAM technology and development. Under the terms of the agreement, Jinhua would provide US$300 million for purchasing necessary equipment for DRAM development and would pay US$400 million to UMC based on the progress of DRAM development. In or around April 2016, Taiwan's Ministry of Economics approved the UMC and Jinhua technology cooperation agreement.

18. In the years leading up to the technology cooperation agreement, UMC did not have advanced DRAM technology and had not been producing DRAM. UMC, however, had intentions to take over DRAM business in China.

19. In September 2015, UMC hired Chen, who was previously the President of MMT and the site director of MMT's Fabrication Facility 16 in charge of producing Micro's 25nm DRAM product, to be the Senior Vice President of UMC. In January 2016, UMC established the NBD division for developing DRAM technology to transfer to Jinhua and placed Chen in charge of the NBD division.

20. From in or around October 2015 through April 2016, Chen recruited and hired two MMT employees to work for UMC and develop F32nm DRAM technology.

21. In or around November 2015, Chen hired a former MMT employee ("Employee 1") to work for UMC. Prior to leaving MMT, Employee 1 stole confidential and proprietary materials belonging to Micron, including trade secrets pertaining to the prior, current, and future generations of Micron's DRAM technology, including the 80 (30nm), 90 (25nm), 100 (20nm), and 110 (1Xnm) series DRAM. While working at UMC, Employee 1 referenced the stolen Micron materials to support UMC's design of the F32nm DRAM technology for transfer to Jinhua pursuant to the two companies' technology transfer agreement. Employee 1 stored the stolen Micron trade secrets, including Trade Secrets 1, 6, 7, and 8, discussed *infra* Paragraphs 33-40, on one or more digital devices belonging to

UMC.

22. Between in or around December 2015 and April 2016, Employee 1, acting as an agent of UMC, communicated with a current employee of MMT ("Employee 2"). Employee 2 provided Employee 1 with confidential and proprietary Micron information to further UMC's F32nm DRAM technology design, including information related to Micron's wafer specifications for its 25nm DRAM chip.

23. On April 26, 2016, Employee 2 left MMT's employment. Employee 2 told MMT that he was leaving to work at his family business, and he signed the MMT Declaration of Resignation, declaring and certifying that he did not keep any documents, confidential or otherwise, belonging to the company, and that he destroyed any hard copy or electronic forms in his possession or control that were stored on non-Micron property, including computers, phone, personal email, or file sharing accounts. Employee 2 did not leave to work for his family business but rather immediately began working for UMC.

24. In the weeks leading up to Employee 2's resignation from MMT, he downloaded over 900 confidential and proprietary files belonging to Micron, including Trade Secrets 1-8, discussed *infra* Paragraphs 33-40, by downloading the files from Micron servers and transferring them to USB external storage devices or uploading the files to his personal Google Cloud account stored on servers in the United States. Many of the files were marked "Micron Confidential," "Micron Technology, Inc., Confidential and Proprietary," or "Micron Confidential/Do Not Duplicate." The created dates in the Google files metadata showed that Employee 2 accessed Micron confidential and proprietary files both before and after he left Micron employment, and while working at UMC.

25. In the weeks leading up to Employee 2's resignation from MMT, Employee 2 ran numerous deletion processes and a CCleaner program on his laptop computer to mask his theft of Micron trade secrets. He also conducted numerous internet searches, accessing a number of publicly available news articles about the PRC government's support of the growth of the DRAM business in the PRC, and specifically on UMC and Jinhua's cooperation toward creating and producing DRAM.

26. While working at UMC, Employee 2 referenced Micron trade secrets to assist and further

U.S. COMPLAINT             7
FOR INJUNCTIVE RELIEF

UMC's development of its F32nm DRAM technology. In or around July or August 2016, Employee 2, at the direction of a UMC employee, referenced Micron's Trade Secret 5 and provided critical design rule data to that employee to further UMC's development of its F32nm DRAM technology, knowing that UMC would transfer the technology to Jinhua. Employee 2 used his UMC-assigned laptop to access his Google Drive, download a copy of Trade Secret 5, and reference the data contained therein to assist UMC with its F32nm DRAM design rule. UMC employees were directed to use the information Employee 2 provided to complete UMC's F32nm DRAM design rule. Trade Secret 5 and UMC's F32nm DRAM design rule were stored in Employee 2's Google Drive, and a comparison of the two show Micron's information being used in UMC's F32nm DRAM design rule document.

27. On October 23, 2016, Chen, UMC, Jinhua, and government officials from the PRC attended a Jinhua/UMC recruiting fair in the Northern District of California to recruit employees from the United States with semi-conductor experience to work for both companies in either the research and development or sales and marketing division. Chen stated at the recruiting fair that UMC had transferred its 25nm DRAM chip to Jinhua. On or about October 24, 2016, Chen and others from UMC and Jinhua, including the mayors from the PRC cities of Jinjiang and Quanzhou, also visited semiconductor equipment-manufacturing companies Applied Materials, Lam Research, and KLA Tencor, all located in the Northern District of California, to facilitate its DRAM production process. While at the recruiting fair and visiting the equipment-manufacturing companies in the Northern District of California, Chen, UMC, and Jinhua had obtained and were in continuous control of the stolen Micron trade secrets.

28. From in or around September 2016 through March 2017, UMC and Jinhua filed five patents and a patent application concerning DRAM technology that contained information that was the same or very similar to technology described in Micron's Trade Secrets 2 and 6. Employee 1 was listed as an inventor in each of the five patents and the patent application. The patents were subsequently jointly issued to UMC and Jinhua. The information contained in the patents and patent application contained Micron trade secrets that could not be obtained through reverse engineering.

29. In February 2017, Taiwan law enforcement authorities executed search warrants and

seized items from UMC's offices and the residences of Employee 1 and 2. They found electronic and hard copy files containing Micron trade secrets in areas and on devices associated with UMC and belonging to Employee 1 and 2. Knowing that Taiwan law enforcement was on its way to execute search warrants at UMC, another UMC employee directed both Employee 1 and 2 to remove any electronic devices they possessed that contained Micron information on them. Some of the electronic devices that contained Micron information were turned over to Taiwan law enforcement. At least one electronic device that contained Micron information was not turned over to Taiwan law enforcement and had been concealed by UMC and Chen.

30. In or around February 2017, in addition to his position at UMC, Chen assumed the post of President of Jinhua.

Violations of 18 U.S.C. § 1832(a)(5): Conspiracy to Commit Theft of Trade Secrets

31. As set forth in Paragraphs 15-30, beginning in or about October 2015, and continuing to present day, defendants UMC, Jinhua and Chen, along with others named as defendants in the Indictment, knowingly combined, conspired, and agreed to:

   a. knowingly steal and without authorization appropriate, take, carry away, and conceal, and by fraud, artifice and deception obtain trade secrets belonging to Micron;

   b. knowingly and without authorization copy, duplicate, sketch, draw, photograph, download, upload, alter, destroy, photocopy, replicate, transmit, deliver, send, mail, communicate, and convey trade secrets belonging to Micron; and

   c. knowingly receive, buy, and possess trade secrets belonging to Micron, knowing the same to have been stolen, appropriated, obtained, and converted without authorization; intending to convert a trade secret that is related to a product, namely DRAM, that is used in and intended for use in interstate and foreign commerce, to the economic benefit of someone other than Micron, and intending and knowing that the offense would injure Micron,

in violation of Title 18, United States Code, Section 1832(a)(5).

Violations of 18 U.S.C. §§ 1831(a)(3) - Economic Espionage (Receiving and Possessing Stolen Trade Secrets)

32. As set forth in Paragraphs 15-30, beginning in or about February 2016, and continuing to present day, defendants UMC, Jinhua and Chen, along with others named as defendants in the Indictment, intending and knowing that they would benefit a foreign government, foreign instrumentality, and foreign agent, knowingly received, bought, and possessed Trade Secrets 1 through 8, knowing them to have been stolen and appropriated, obtained, and converted without authorization, in violation of Title 18, United States Code, Section 1831(a)(3).

## MICRON'S TRADE SECRETS

As set forth in the Indictment:

33. Micron is the only United States-based company that manufactures DRAM. Micron's headquarters are in Boise, Idaho, and it maintains a large office in the Northern District of California. Micron became a major participant in the global semiconductor industry with its purchase of Texas Instruments' DRAM memory business in 1998 and thereafter specialized in the advanced research and development and manufacturing of memory products including, but not limited to, DRAM. Micron provides approximately 20-25% of the world supply of DRAM.

34. The trade secrets identified below consisted of detailed, confidential information used to design and construct efficient manufacturing processes for advanced DRAM technology. The development of this information and its confidentiality provides Micron with a significant competitive advantage in the world market. This competitive advantage allows Micron to remain in business and continue to research and develop advanced DRAM for commercial and other uses.

35. MMT was one of Micron's fabrication plants in Taiwan that engaged in making DRAM. MMT assigned all intellectual property, including all trade secrets that it developed, to Micron.

36. Micron's DRAM technology included, but was not limited to, the following trade secrets, as defined in 18 U.S.C. § 1839(3):

    a. **Trade Secret 1**: The Micron process to manufacture and produce DRAM contained in

the totality of information stolen by Employees 1 and 2 from Micron and provided to UMC and Jinhua under the direction of Chen and others. Trade Secret 1 included ways and means in which proprietary and non-proprietary components were compiled and combined by Micron to form substantial portions of the DRAM design and manufacturing process, including Trade Secrets 2 through 8, below.

b. **Trade Secret 2**: A 233-page PDF document identified with digital filename "FAB16 90s Traveler-20150518" (hereafter "25nm Process Traveler document"). The 25nm Process Traveler document contained comprehensive and very detailed information documenting the beginning-to-end manufacturing process for Micron's 25nm DRAM product, including details of specifications and production processes.

c. **Trade Secret 3**: An Excel spreadsheet with multiple tabs identified with digital filename "(ALL) IMP conditions Table_20150318" (hereafter "Implant Conditions Table"). The Implant Conditions Table contained implant data required to make each of the various different transistor types required to make a 25nm DRAM product. Data in the Implant Conditions Table included very specific details of the relevant particular process code - which could be matched back to process descriptions in Trade Secret 2.

d. **Trade Secret 4**: An Excel spreadsheet with multiple tabs identified with digital filename "Implant Condition for MES setting_1015" (hereafter "Implant Conditions for MES document"). MES referred to a particular software used to track the 25nm DRAM product through the fabrication process, and the Implant Conditions for MES document was a tracking document that informed the software. The document inputted into the MES software enabled Micron to closely monitor and manage its 25nm DRAM fabrication process. The Implant Conditions for MES document provided critical details to manage the fabrication of the 25nm DRAM product through the fabrication process and provided information on the precision and outcome of each particular step.

e. **Trade Secret 5**: An Excel spreadsheet with multiple tabs identified with digital filename "[DR25nmS] Design rules Periphery_EES_2012000026-013_Rev.13" (hereafter "Design Rules document"). The Design Rules document contained detailed design specifications for the architecture of the 25nm DRAM product, including details on how to layer Micron's 25nm DRAM product. The

Design Rules document included precise information on how to build distances between elements in a DRAM product to avoid electrical and physical interference. The Design Rules document included Micron trade secrets related to these types of specifications, which were critical information needed to build a 25nm DRAM product.

  f. **Trade Secret 6**: A 302-page PDF document identified with digital filename "DRAM_100_series_(20nm)_traveler_(v00h) 150730" (hereafter "20nm Process Traveler document"). The 20nm Process Traveler document contained the specific types of details summarized in the 25nm Process Traveler document but for the next generation 20nm DRAM product. The 20nm Process Traveler document also contained details regarding Micron's upgrade from the 25nm to the 20nm DRAM product and contained trade secret information pertinent to both generations of the product.

  g. **Trade Secret 7**: A 360 page PDF identified with digital filename "dram_110_series_(1xnm)_traveler_(z11a)-20150915.pdf" (hereafter "1xnm Process Traveler document"). The 1xnm Process Traveler document contained the comprehensive and very detailed information documenting the beginning-to-end manufacturing process for Micron's 1xnm DRAM product, including details of specifications and production processes. The 1xnm DRAM product was Micron's most advanced DRAM at the time. The 1xnm Process Traveler document also contained details regarding Micron's upgrade from the 20nm DRAM product to the 1xnm DRAM product and contained trade secret information pertinent to both generations of the product.

  h. **Trade Secret 8**: A 260 page PDF identified with digital filename "dram_1xnm_process_(Z11AA41200)_-_summary_flow_document" (hereafter "1xm Process Summary Flow document"). The 1xnm Process Summary Flow document contained the manufacturing process of the 1xn DRAM chip as it flowed through the manufacturing facility. It compared the 1xnm process flow with prior generations of DRAM products. It described the evolution of the DRAM product to the 1xnm generation, explaining the purpose and reasons why certain changes and upgrades were made from one generation to the next.

  37. Micron took reasonable measures to keep Trade Secrets 1 through 8 secret, including physical, electronic, legal, and policy measures.

38. The information contained in Trade Secrets 1 through 8 derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

39. UMC did not, prior to the events alleged in this Complaint, possess advanced DRAM-related technology and did not produce DRAM. Beginning in 2016, UMC and Jinhua filed patent applications concerning DRAM technology that contain information that is the same or very similar to the misappropriated trade secrets – information that could not be obtained through reverse engineering. UMC and Jinhua could not have filed the patent applications, nor manufacture advanced DRAM, within this short time period except through exploitation of Micron's stolen trade secrets.

40. The value of Trade Secrets 1 through 8, and each of them, to UMC and Jinhua, was at least $400 million and up to $8.75 billion, including expenses for research and design and other costs of reproducing the trade secrets that UMC and Jinhua avoided by the actions alleged in Paragraphs 15-30.

### FIRST CAUSE OF ACTION
### 18 U.S.C. § 1836(a)

41. The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

42. Title 18, United States Code, Section 1836(a) empowers the Attorney General to obtain appropriate injunctive relief against any violation of 18 U.S.C. §§ 1831 or 1832.

43. As set forth above, Defendants violated 18 U.S.C. § 1831(a)(5) (conspiracy to commit economic espionage); 18 U.S.C. § 1832(a)(5) (conspiracy to commit theft of trade secrets); and 18 U.S.C. § 1831(a)(3) (Economic espionage – receipt and possession of stolen trade secrets).

44. The United States seeks permanent injunctive relief to prevent Defendants from using or conveying Micron's trade secrets. In particular, the United States seeks an order prohibiting Defendants from: (1) exporting, reexporting, causing the export of, attempting to export to the United States; selling or supplying, directly or indirectly to the United States; or causing the import into the United States of

any products containing DRAM manufactured by Jinhua or UMC; or conducting any transaction that evades or avoids or has the purpose of evading or avoiding that prohibition; or (2) transferring or in any way conveying Trade Secrets 1-8 to any other individual or entity.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants through a Final Order that permanently enjoins Chen, UMC, Jinhua, and their agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from the unauthorized acquisition, disclosure, use, duplication, or distribution of the Micron trade secrets, including through a prohibition on: (1) exporting, reexporting, causing the export of, attempting to export to the United States; selling or supplying, directly or indirectly to the United States; or causing the import into the United States of any products containing DRAM manufactured by Jinhua or UMC; or conducting any transaction that evades or avoids or has the purpose of evading or avoiding that prohibition; or (2) transferring or in any way conveying Trade Secrets 1-8 to any other individual or entity; and for all such further relief as may be just and proper.

Respectfully submitted,

ALEX G. TSE
United States Attorney

*/s Kimberly Friday*
KIMBERLY FRIDAY
Assistant United States Attorney

Attorneys for the United States of America

DATED: November 1, 2018

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
United States of America

**DEFENDANTS**
United Microelectronics Corporation; Fujian Jinhua Integrated Circuit, Co., Ltd.; Chen Zhengkun a.k.a. Stephen Chen

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Hsinchu, Taiwan
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Assistant United States Attorney Kimberly Friday, U.S. Attorney's Office, Northern District of California, 450 Golden Gate Avenue, 11th Floor, San Francisco, CA 94103

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

[X] 1  U.S. Government Plaintiff
[ ] 2  U.S. Government Defendant
[ ] 3  Federal Question *(U.S. Government Not a Party)*
[ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane / 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander / 367 Health Care/ Pharmaceutical Personal Injury Product Liability | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine / 368 Asbestos Personal Injury Product Liability | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle / **PERSONAL PROPERTY** | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability / 370 Other Fraud | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 190 Other Contract | 360 Other Personal Injury / 371 Truth in Lending | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | 362 Personal Injury -Medical Malpractice / 380 Other Personal Property Damage | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise |  / 385 Property Damage Product Liability | 465 Other Immigration Actions | 864 SSID Title XVI | [X] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** |  | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 440 Other Civil Rights / **HABEAS CORPUS** |  | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 441 Voting / 463 Alien Detainee |  | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 442 Employment / 510 Motions to Vacate Sentence |  | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 240 Torts to Land | 443 Housing/ Accommodations / 530 General |  |  | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 445 Amer. w/Disabilities–Employment / 535 Death Penalty |  |  | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 446 Amer. w/Disabilities–Other / **OTHER** |  |  |  |
|  | 448 Education / 540 Mandamus & Other |  |  |  |
|  | / 550 Civil Rights |  |  |  |
|  | / 555 Prison Condition |  |  |  |
|  | / 560 Civil Detainee–Conditions of Confinement |  |  |  |

**V. ORIGIN** *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from Another District *(specify)*
[ ] 6 Multidistrict Litigation–Transfer
[ ] 8 Multidistrict Litigation–Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. 1836(a)
Brief description of cause:
Complaint for injunctive relief

**VII. REQUESTED IN COMPLAINT:**
[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes  [X] No

**VIII. RELATED CASE(S), IF ANY** *(See instructions)*
JUDGE: Hon. Maxine M. Chesney
DOCKET NUMBER: CR 18-465-MMC

**IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)**
*(Place an "X" in One Box Only)*
[ ] SAN FRANCISCO/OAKLAND  [X] SAN JOSE  [ ] EUREKA-MCKINLEYVILLE

DATE: 11/01/2018
SIGNATURE OF ATTORNEY OF RECORD: /s/ Kimberly Friday